IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆◆

ANNETTE SUTTON, individually and o/b/s E.S.,

*Plaintiff-Appellant,*

—v.—

PLAINFIELD BOARD OF EDUCATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

## BRIEF FOR *AMICUS CURIAE* COUNCIL OF PARENT ATTORNEYS AND ADVOCATES, INC. IN SUPPORT OF APPELLANT/REVERSAL

---

ELLEN M. SAIDEMAN
LAW OFFICE OF ELLEN SAIDEMAN
7 Henry Drive
Barrington, Rhode Island 02806
(401) 258-7276

SELENE ALMAZAN-ALTOBELLI
COUNCIL OF PARENT ATTORNEYS
  AND ADVOCATES
PO Box 6767
Towson, Maryland 21285
(844) 426-7224

CATHERINE M. REISMAN
REISMAN CAROLLA GRAN
  & ZUBA LLP
19 Chestnut Street
Haddonfield, New Jersey 08033
(856) 354-0021

*Attorneys for Amicus Curiae*
*Council of Parent Attorneys and Advocates*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, the following disclosure is made on behalf of

these entities:

Council of Parent Attorneys and Advocates

1. No Amicus is a publicly held corporation or other publicly held entity;
2. No Amicus has parent corporations; and
3. No Amicus has 10% or more of stock owned by a corporation.

Respectfully submitted,


*/s/ Selene Almazan-Altobelli*
Selene Almazan-Altobelli

# TABLE OF CONTENTS

CORPORATE DISCLOSURE ...................................................................... i

TABLE OF CONTENTS ........................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

STATEMENT OF INTEREST ................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 3

FACTUAL BACKGROUND ...................................................................... 4

ARGUMENT ............................................................................................... 4

    I.    IDEA SECURES APPROPRIATE EDUCATIONAL SERVICES FOR ALL STUDENTS THROUGH INFORMED PARENTAL INVOLVEMENT AND PROCEDURAL PROTECTIONS ................... 4

    II.   THE DECISION BELOW UNDERMINES IDEA'S BASIC PURPOSE OF ENSURING A FREE APPROPRIATE EDUCATION TO ALL STUDENTS ........................................................................................... 7

         A.    Parental Enforcement, Integral to the Effective Functioning of the IDEA, Must Be an Option for All Parents ...................................... 7

         B.    Awarding Attorney's Fees to Parents Who Successfully Defend Against District Claims Is Essential to Enabling All Parents to Obtain Legal Assistance to Fulfill the Mandates of IDEA and the HCPA ......................................................................................... 13

    III.  THIS COURT HAS CONSISTENTLY REJECTED ATTEMPTS TO LIMIT "PREVAILING PARTY" STATUS UNDER IDEA IN A MANNER THAT UNDERMINES THE STATUTORY PURPOSE ..... 19

CONCLUSION ........................................................................................... 26

CERTIFICATION OF COMPLIANCE PURSUANT TO FED. R. APP. 32(a) (7)(C) ...................................................................................................... 28

CERTIFICATE OF SERVICE .................................................................. 28

VIRUS CERTIFICATION & IDENTICAL COMPLIANCE OF RELIEF ............29

CERTIFICATES OF BAR MEMBERSHIP ..........................................................29

# TABLE OF AUTHORITIES

**Cases**

*Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U.S. 240 (1975)............11

*Angela L. v. Pasadena Indep. Sch. Dist.*, 918 F.2d 1188 (5th Cir. 1990) ................9

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006)................2

*Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982)..................................................... 6, 20

*Bd. of Educ. v. Tom F.*, 552 U.S. 1 (2007)..............................................................2

*Bricklayers & Allied Craftworkers Local 1 of Pa/De v. ARB Constr., Inc.*,
   No. 13-3883, 2016 U.S. Dist. LEXIS 128954, 2016 WL 4943254
   (E.D. Pa. Sept. 15, 2016) .......................................................................................23

*Brown v Board of Educ.*, 347 U.S. 483 (1954) ........................................................5

*Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*,
   532 U.S 598 (2001) ..............................................................................................23

*Chase Manhattan Bank, N.A., v. Celotex Corp.*, 56 F.3d 343(2d Cir. 1995) ..........22

*Claiborne v. Wisdom*, 414 F.3d 715 (7th Cir. 2005) ...............................................22

*Cole v. Hall*, 462 F.2d 777 .....................................................................................12

*E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68 (3d Cir. 2018)........................21

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017) ................ 2, 6, 7

*Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009) ..........................................2, 5

*Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017)..................................................2

*G.W. v. Ringwood Bd. of Educ.*, 28 F.4th 465 (3d Cir. 2022) ..................................6

*H.E. v. Walter D. Palmer Leadership Learning Partners Charter Sch.*,

873 F.3d 406 (3d Cir. 2017) ........................................................ 20, 21

*Hall* v. *Cole*, 412 U.S. 1 (1973) ...........................................................12

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ............................................19

*Honig v. Doe,* 484 U.S. 305 (1988) ........................................................6

*J.B. v. San Jose Unified School District,* No. C 12-06358 SI, 2013 U.S. Dist. LEXIS 65083, 2013 WL 1891398 (N.D. Cal. May 6, 2013) ...............................24

*Jackson v. Dow Chem. Co.*, 518 Fed. App'x 99 (3d Cir. 2013) ...........................24

*John T. v. Delaware County Intermediate Unit*, 318 F.3d 545 (3d Cir. 2003) .......25

*King v. Burwell,* 576 U.S. 473 (2015) ....................................................4

*Kruelle v. New Castle County Bd. of Educ.*, 642 F.2d 687 (3d Cir. 1981)................6

*M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 227 (3d Cir. 2017) .......................... *passim*

*Mills v. Board of Educ.,* 348 F. Supp. 866 (D.D.C. 1972) ........................................5

*Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115 (9th Cir. 2003) ........................6

*Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, 334 F. Supp. 1257 (E.D. Pa. 1971), modified 343 F. Supp. 279 (1972) ................................................5

*Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859 (2023)....................................................2

*Riverside v. Rivera*, 477 U.S. 561 (1986) ................................................13

*Schaffer v. Weast*, 546 U.S. 49 (2005)....................................................2, 7

*School Comm. of Burlington v. Dep't of Educ. of Mass.,* 471 U.S. 359 (1985) ...........................................................................5

*Smith v. Robinson*, 468 U.S. 992 (1984)....................................... *passim*

*United States v. Lopez*, 514 U.S. 549 (1995).............................................4

*Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007)............................. 2, 5, 7

v

**Statutes**

20 U.S.C. § 1400, *et seq.*.................................................................. *passim*

20 U.S.C. § 1400(d)(1)(B) ...................................................................8

20 U.S.C. § 1401(9) .............................................................................6

20 U.S.C. § 1412(a)(1)(A) ....................................................................3

20 U.S.C. § 1414(a)(1)(D) ....................................................................6

20 U.S.C. § 1414(d)(1)(B) ....................................................................6

20 U.S.C. § 1415(i)(3)(B)(i) .............................................................3, 19

20 U.S.C. § 1415(i)(3)(C) ....................................................................3

20 U.S.C. § 1415(j) .............................................................................19

29 U.S.C. § 794 ........................................................................ 2, 9, 10

42 U.S.C. § 1983 ..................................................................... 1, 11, 12

42 U.S.C. § 1988 ........................................................................ 11, 12

42 U.S.C. § 12131, *et seq*...............................................................2, 23

**Regulations**

34 C.F.R. § 300.502(b)(2)...................................................................17

**Rules**

Fed. R. Civ. P. 41(a)...........................................................................25

Fed. R. App. P. 29 ................................................................................1

**Legislative History**

122 Cong. Rec. 33313 (1976) .........................................................

131 Cong. Rec. S. 10396 ......................................................10

H.R. 6014, 98th Cong., 2d Sess.,
   130 Cong. Rec. H7688 (daily ed. July 24, 1984) ...............9

H.R. REP. NO. 94-1558 ......................................................9

H.R. Rep. No. 99-296 ......................................................10

S. 2859, 98th Cong., 2d Sess.,
   130 Cong. Rec. S. 9078 (daily ed. July 24, 1984) ............9

S. Rep. NO. 94-1011,
   *as reprinted in* 1976 U.S.C.C.A.N. 5908 (1976) .............. 9, 11, 12

S. Rep. No. 99-112 ....................................................... 5, 9, 10

S. Rep. No. 99-371 ......................................................10

S. Rep. No. 99-372 ......................................................10

**Other Authorities**

Debra Chopp, *School Districts and Families Under the IDEA: Collaborative in Theory, Adversarial in Fact*, 32-2 Nat'l Ass'n Admin. L. Judiciary 423 (2014) ......................................................14

Elisa Hyman, *et al.*, *How IDEA Fails Families Without Means: Causes and Correcions from the Frontlines of Special Education Lawyering,* 20 Am. U. J. Gender Soc. Pol'y and L. 107 (2011) .........13

Eloise Pasachoff, *Special Education, Poverty, and the Limits of Private Enforcement*, 86 Notre Dame L. Rev. 1413 (2011) .............. 11, 12

G. Thomas Schanding, *et al.*, *Analysis of Due Process Hearings in Texas* ............14

Kathryn A. Sabbeth, *What's Money Got to Do with It?: Public Interest Lawyering and Profit,* 91 Denv. U.L. Rev. 441, 467 (2014) ......13

Kevin Hoagland-Hanson, *Comment: Getting Their Due (Process): Parents and Lawyers in Special Education Due Process Hearings in Pennsylvania*, 163 U. Penn. L. Rev. 1806, 1820 (2015) ......................................................14

Lisa Lukasik, *Special Education Litigation: An Empirical Analysis of North Carolina's First Tier*, 118 W. Va. L. Rev. 735, 775 (2016) ................................14

Mark C. Weber, *Litigation Under the Individuals with Disabilities Education Act After Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources,* 65 Ohio St. L.J. 357 (2004)....................................................7

Melanie Archer, *Access and Equity in the Due Process System: Attorney Representation and Hearing Outcomes in Illinois, 1997-2002* (2002)................15

Myron Schreck, *Attorneys' Fees for Administrative Proceedings Under the Education of the Handicapped Act: of Carey, Crest Street and Congressional Intent*, 60 Temple L.Q. 599 (1987)........................................................................9

Perry A. Zirkel, *Are the Outcomes of Hearing (and Review) Officer Decisions Different for Pro Se and Represented Parents?*, 34-2 J. Nat'l Ass'n Admin. L. Judiciary 263 (2014)............................................................................................15

Perry A. Zirkel & Diane M. Holben, *District Initiated Due Process Decisions under the IDEA; Frequency and Outcomes,* 398 Educ. L Rep. 8 (2022) ............16

Perry A. Zirkel & Diane M. Holben, *District Initiated Due Process Decisions under the IDEA; A Follow-Up Analysis,* 398 Educ. L Rep. 584 (2022) ................................................................... *passim*

Todd Carney, *How Increased Legal Representation Can Close the Gap in Special Education Discrepancies*, 37 Touro L. Rev. 21, 60 (2021) ................................14

William H. Blackwell & Vivian V. Blackwell, *A Longitudinal Study of Special Education Due Process Hearings in Massachusetts: Issues, Representation, and Student Characteristics*, at 10 (Mar. 23, 2015) ....................................................15

**Council of Parent Attorneys and Advocates (COPAA)** is a not-for-profit

organization of parents of children with disabilities, their attorneys and advocates,

in 48 states and the District of Columbia, who are routinely involved in special

education advocacy and due process hearings throughout the country. COPAA

believes effective educational programs for children with disabilities can only be

developed and implemented with collaboration between parents and educators as

equal parties. COPAA does not undertake individual representation but provides

resources, training, and information for parents, advocates and attorneys to assist in

obtaining the free appropriate public education (FAPE) such children are entitled

to under the Individuals with Disabilities Education Act 20 U.S.C. § 1400, *et seq.*

(IDEA). COPAA also supports individuals with disabilities, their parents and

advocates, in attempts to safeguard the civil rights guaranteed to those individuals

under federal laws, including the Civil Rights Act of 1871, ch. 22, 17 Stat. 13

(codified as amended at 42 U.S.C. § 1983), Section 504 of the Rehabilitation Act

---

[1] Pursuant to Fed. R. App. P. 29, *Amicus* certifies that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *Amicus* and its members and counsel contributed money intended to fund the brief's preparation or submission.

of 1973, 29 U.S.C. § 794 (Section 504) and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq*. (ADA).

COPAA brings to the Court the unique perspective of parents and advocates for children with disabilities. COPAA has filed as *amicus curiae* in the United States Supreme Court, including *Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 859 (2023); *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386 (2017); *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009); *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007); *Bd. of Educ. v. Tom F.*, 552 U.S. 1 (2007); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006); and *Schaffer v. Weast*, 546 U.S. 49 (2005), and in numerous cases in the United States Courts of Appeal.

COPAA offers a distinctive view on an issue raised by the decision below, which affects the ability of children with disabilities and their families to vigorously advocate for and protect rights under federal law. IDEA embodies substantial procedural safeguards for students and their parents, including the right to equal and meaningful participation in the educational planning process. COPAA has found, however, that students and their parents are often unable to exercise these important procedural and substantive rights without legal representation. The attorney's fees provision is designed to ensure access to

adequate legal representation, which is integral to the achievement of the law's purposes.

*Amicus* has moved for permission to file this brief. Counsel for Appellant has consented to this brief. Counsel for Appellee was unable to consent. *Amicus* is therefore filing this Brief with an accompanying Motion for Leave to File *Amicus Curiae* Brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted IDEA, 20 U.S.C. § 1400 *et seq.*, in 1975, after determining that children with disabilities were routinely denied educational opportunities afforded to children without disabilities. IDEA ensures that each child with a disability receives a comprehensive evaluation of his or her unique needs, and a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A). To further this goal, Congress added a fee-shifting provision to the IDEA in 1986, providing for an award of reasonable attorneys' fees "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i). Congress made clear that fees awarded under the IDEA, as with other civil rights fee-shifting statutes, "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C).

Even with the IDEA's fee-shifting provision, however, structural challenges still exist and prevent low-income families of students with disabilities from

3

enforcing their rights under the IDEA.  Access to legal representation for students

with disabilities and their parents is limited, as few attorneys practice in this

complex, specialized area of law, and even fewer provide such representation

without charge.  Low income and even middle-class families face a dearth of

attorneys available to take their cases on a purely contingent basis because, too

often, a prevailing parent's recovery of attorneys' fees may prove to be elusive

even in the most meritorious cases.  As Congress has recognized, attorney's fees

are essential for parents and their children to vindicate their IDEA rights.

Therefore, we urge the Court to reverse the decision of the District Court and

remand for consideration of an appropriate award of fees.

## FACTUAL BACKGROUND

*Amicus* adopts fully by reference herein the Statement of Facts in the Brief

of Appellant at pages 3-6.

## ARGUMENT

## I.    IDEA SECURES APPROPRIATE EDUCATIONAL SERVICES FOR ALL STUDENTS THROUGH INFORMED PARENTAL INVOLVEMENT AND PROCEDURAL PROTECTIONS

This Court reads "statutory provisions in context, *King v. Burwell,* [576

U.S. 473, 486 (2015)] and must consider any legislative findings that would

'enable [it] to evaluate [Congress's] legislative judgment,' *United States v. Lopez*,

514 U.S. 549, 562-63 (1995)." *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 227 (3d

Cir. 2017). Congress enacted the precursor statute to IDEA "in 1970 to ensure that all children with disabilities are provided 'a free appropriate public education' [FAPE] which emphasizes special education and related services designed to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'" *Forest Grove.*, 557 U.S. at 239 (*quoting Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 367 (1985)). "Along these lines, the IDEA's legislative history reflects that Congress enacted the attorneys' fees provision specifically to ensure 'that due process procedures, including the right to litigation, if that [becomes] necessary, [are] available to all parents." *M.R.,* 868 F.3d at 227, quoting S. Rep. No. 99-112, at 2 (1985)).

Thus, a "proper interpretation of [the IDEA] requires a consideration of the entire statutory scheme." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. at 523. The IDEA "embodies a strong federal policy to provide an appropriate education" for every child with disabilities.

> [I]nterrelated purposes underlay its passage. First, Congress sought to secure by legislation the right to a publicly-supported equal educational opportunity which it perceived to be mandated by *Brown v Board of Educ.*, [347 U.S. 483 (1954)] and explicitly guaranteed with respect to the handicapped by two seminal federal cases, *Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, [334 F. Supp. 1257 (E.D. Pa. 1971), modified 343 F. Supp. 279 (1972)] and *Mills v. Board of Educ.,* [348 F. Supp. 866 (D.D.C. 1972)]. Second, Congress intended the provision of

education services to increase the personal independence and enhance the productive capacities of handicapped citizens.

*Kruelle v. New Castle Cnty. Bd. of Educ.*, 642 F.2d 687, 690-691 (3d Cir. 1981).

The IDEA confers upon students with disabilities an enforceable substantive right to public education in participating States.  *See Honig v. Doe*, 484 U.S. 305, 310 (1988); *G.W. v. Ringwood Bd. of Educ.*, 28 F.4 465, 469 (3d Cir. 2022).  A state must therefore have "policies and procedures in place to ensure that all eligible children receive a FAPE." *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1125 (9th Cir. 2003).

To that end, the IDEA requires that states provide eligible students with "special education and related services that – (A) have been provided at public expense, under public supervision, direction, and without charge; (b) meet the standards of the State educational agency; (c) include an appropriate preschool, elementary school, or secondary education in the State involved; and (D) are provided in conformity with the individualized education program [IEP] required under section 1414(d) of [IDEA]." 20 U.S.C. § 1401(9). States provide these required services through an IEP. Ultimately, an IEP is intended to provide a student with a disability with "meaningful educational progress," appropriate in light of the child's circumstances. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982); *Endrew F.*, 580 U.S. at 399 ("To meet its substantive obligation under

6

the [IDEA], a school must offer an individualized education program (IEP) reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances").

In order to ensure meaningful educational progress through the IEP, parents and guardians must "play a significant role in the IEP process." *Schaffer v. Weast*, 546 U.S. 49, 53 (2005); *see also Winkelman*, 550 U.S. at 519; *Endrew F.*, 580 U.S. at 399 (IDEA contemplates that IEP development "will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians"). Indeed, "one of the central innovations of the special education law, and a key to its success, is that it empowers parents to participate in designing programs for their children and to challenge school district decisions about educational services and placement." Mark C. Weber, *Litigation Under the Individuals with Disabilities Education Act After Buckhannon Board & Care Home, Inc. v. West Virginia Dep't of Health & Human Resources, 65* Ohio St. L.J. 357, 369 (2004). Thus, to facilitate the provision of a FAPE in accordance with an appropriate IEP, the IDEA contains significant procedural protections for parents. *Winkelman*, 550 U.S. at 524; *Schaffer*, 546 U.S. at 53.

## II. THE DECISION BELOW UNDERMINES IDEA'S BASIC PURPOSE OF ENSURING A FREE APPROPRIATE EDUCATION TO ALL STUDENTS

### A. Parental Enforcement, Integral to the Effective Functioning of the IDEA, Must Be an Option for All Parents

The United States Supreme Court made clear in *Winkelman*, that the "IDEA grants parents independent, enforceable rights." 550 US at 533. Those rights include "the entitlement to a free appropriate public education for the parents' child." *Id.* The Court noted that, if parents were not allowed to enforce their child's right to a FAPE, the "potential for injustice in this result is apparent." *Id.*. Recognizing the importance of parental advocacy to ensure the protection of the rights of children with disabilities, Congress included parents in every critical point of the statutory scheme. *See, e.g.,* 20 U.S.C. §§1400(d)(1)(B), 1414(a)(1)(D) and 1414(d)(1)(B) . When Congress required States to provide FAPE at no cost to parents, it did not intend "that only some parents would be able to enforce that mandate." *Id.* Thus, any interpretation of the IDEA must take into account access for the families of students regardless of the parents' economic means.

Access to the protections afforded by the IDEA was guaranteed by Congress through the inclusion of fee shifting provisions in the Handicapped Children's Protection Act of 1985 (HCPA), P.L. 99-372, 100 Stat. 796. Congress enacted the HCPA in response to *Smith v. Robinson*, 468 U.S. 992 (1984), which denied parents the right to collect attorney's fees in cases brought under the predecessor to the IDEA, the Education for All Handicapped Children Act of 1975 (EHA) 94 Pub. L. No. 142, 89 Stat. 773. The Court decided *Smith* on July 5, 1984. The House and Senate Bills to remedy the *Smith* ruling were both introduced before the end of

July, 1984. Myron Schreck, *Attorneys' Fees for Administrative Proceedings Under the Education of the Handicapped Act: of Carey, Crest Street and Congressional Intent*, 60 Temple L.Q. 599. 612 n. 91 (1987) (citing S. 2859, 98th Cong., 2d Sess., 130 Cong. Rec. S. 9078 (daily ed. July 24, 1984); H.R. 6014, 98th Cong., 2d Sess., 130 Cong. Rec. H7688 (daily ed. July 24, 1984)).

The HCPA was based on Section 1988 and other federal fee-shifting provisions in civil rights legislation. S. Rep. No. 99-112, at 14; *Angela L. v. Pasadena Indep. Sch. Dist.,* 918 F.2d 1188, 1193 (5th Cir. 1990) (prevailing party analysis pertinent to claims for fees under HCPA). One of the congressional purposes in providing attorney's fees in civil rights cases was to eliminate financial barriers to the vindication of constitutional rights and to stimulate voluntary compliance with the law. S. Rep. No. 94-1011, *as reprinted in* 1976 U.S.C.C.A.N. 5908, 5913; H.R. Rep. No. 94-1558 (1976)

The legislative history of the HCPA undeniably establishes the primacy of the fee provision in the enforcement scheme for federal special education laws. The House Report states:

> In sum, since 1978, it has been Congress' intent to permit parents or guardians to pursue the rights of handicapped children through EHA, section 504, and section 1983. Attorneys' fees could be awarded under section 504 (by virtue of section 505) and under section 1983 (by virtue of section 1988) . . . Congressional intent was ignored by the U.S. Supreme Court when, on July 5, 1984, it handed down its decision in *Smith v. Robinson*. . . . H.R. 1523 is designed to: (1) authorize courts to award reasonable

attorneys' fees to parents of handicapped children who prevail in actions or proceedings under EHA; (2) re-establish statutory rights repealed by the US. Supreme Court in *Smith v. Robinson* . . . .

H.R. Rep. No. 99-296, at 4.

The Senate Report similarly emphasized the importance of fee-shifting to ensure compliance with the IDEA, stating:

> Congress' original intent was that due process procedures, including the right to litigation if that became necessary, be available to *all parents*. On July 5, 1984, the Supreme Court, in *Smith v. Robinson* . . . determined that Congress intended the EHA provide the exclusive source of rights and remedies in special education cases covered by that act. The effect of this decision was to preclude parents from bringing special education cases under section 504 of the Rehabilitation Act of 1973, <u>and recovering attorney's fees available under section 505 of that act.</u>

S. Rep. No. 99-112, at 2 (emphasis supplied); *see also* 131 Cong. Rec. S. 10396 ("unless the EHA is to become a mere hollow pronouncement which the financially strapped parents and legal representatives of handicapped children cannot enforce, Congress must guarantee access to legal counsel to assist parents in obtaining what is guaranteed to them by EHA") (remarks of Sen. Weicker). The committee's intent was clear – to ensure that children with disabilities would be provided with fee awards on a basis similar to other fee shifting statutes. S. Rep. No. 99-112, at 14.

Any interpretation of the IDEA that drastically limits the ability of families to recover their fees will undermine the statutory purposes of achieving an appropriate education for *all*:

> The wealth-based disparities in private enforcement raise troubling questions about the IDEA's effectiveness for children in poverty. Nothing in the statute suggests that it is intended to privilege comparatively wealthy children. To the contrary, while the statute is a universal rather than a means-tested program, its intent to pay particular attention to traditionally disadvantaged populations is clear. As a matter of history, the statute grew out of lawsuits brought by civil rights attorneys and poverty lawyers, who went on to be instrumental in drafting the original statutory provisions in ways that they thought would benefit their clients.

Eloise Pasachoff, *Special Education, Poverty, and the Limits of Private Enforcement*, 86 Notre Dame L. Rev. 1413, 1430 (2011). The disparity in access created by a crabbed reading of the fee-shifting statute "is particularly disturbing because children with disabilities are more likely to live in poverty than children in the general population are." *Id.* at 1432.

In the *Smith* dissent, Justice Brennan, citing to the legislative history of Section 1988, emphasized the central importance of fee awards in cases where individual citizens must act as private attorneys general to enforce federal civil rights laws:

> [A]lthough Congress, in enacting § 1988, did not specifically refer to the applicability of § 1983 to constitutional claims by handicapped children seeking education, it clearly intended to authorize attorney's fees in all cases involving the deprivation of civil rights. Adopted in response to this Court's decision in

*Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U.S. 240 (1975), § 1988 was intended to close "anomalous gaps in our civil rights laws whereby awards of fees are . . . unavailable." S. Rep. No. 94-1011, p. 4 (1976). The Senate Report thus stated:

> "In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court."
>
> . . . .
>
> "'Not to award counsel fees in cases such as this would be tantamount to repealing the Act itself by frustrating its basic purpose. . . . Without counsel fees the grant of Federal jurisdiction is but an empty gesture. . . .' *Hall* v. *Cole*, 412 U.S. 1 (1973), *quoting* 462 F.2d 777, 780-81 (2d Cir. 1972)."
>
> "The remedy of attorneys' fees has always been recognized as particularly appropriate in the civil rights area, and civil rights and attorneys' fees have always been closely interwoven." *Id.*, at 2-3."

*Smith*, 468 U.S. at 1029-30 (quoting S. Rep. No. 94-1011, p. 4 (1976)).

Unfortunately, "[t]here is a growing literature on the problem of economic disparities in the implementation and enforcement of the IDEA. Chief among the concerns in the literature is that wealthier parents use the private enforcement mechanisms more than poor parents do." Pasachoff, 86 Notre Dame L. Rev. at 1417-18. The fee-shifting provision in the HCPA, like all other fee-shifting provisions, "are thought to level the playing field for individuals without financial

resources, as they are designed to encourage attorneys to take up the meritorious cases of plaintiffs, especially those who would otherwise not be able to afford legal fees." *Id.* at 1424-25; *see also* Kathryn A. Sabbeth, *What's Money Got to Do with It?: Public Interest Lawyering and Profit,* 91 Denv. U.L. Rev. 441, 467 (2014) (Congress wanted aggrieved persons to pursue certain categories of cases, and wanted lawyers to represent plaintiffs in those cases). "If the citizen does not have the resources, his day in court is denied him; the congressional policy which he seeks to assert and vindicate goes unvindicated; and the entire Nation, not just the individual citizen, suffers." *Riverside v. Rivera*, 477 U.S. 561, 575 (1986) (quoting 122 Cong. Rec. 33313 (1976) (remarks of Sen. Tunney)).

The purpose of the HCPA was undeniably to encourage liberal application of the fee-shifting provisions. This is consistent with the Act's emphasis on procedural protections for parents to secure FAPE for covered students.

### B. Awarding Attorney's Fees to Parents Who Successfully Defend Against District Claims Is Essential to Enabling All Parents to Obtain Legal Assistance to Fulfill the Mandates of IDEA and the HCPA

The scarcity of attorneys available to assist families with children with disabilities is well established, particularly for families unable to pay for attorneys and experts. Elisa Hyman, *et al.*, *How IDEA Fails Families without Means: Causes and Corrections from the Frontlines of Special Education Lawyering*, 20 Am. U. J. Gender Soc. Pol'y & L. 107, 111 (2011).

Recent studies confirm that without counsel, parents left on their own are without the experience or ability to "navigat[e] the intricacies of disability definitions, evaluations processes, the developments of IEPs, the complex procedural safeguards, among other provisions in the statute," and, as a result, parents of students who were represented by counsel were far more likely to be successful in the IDEA claims than those without counsel. Lisa Lukasik, *Special Education Litigation: An Empirical Analysis of North Carolina's First Tier*, 118 W. Va. L. Rev. 735, 775 (2016) (over twelve years, North Carolina pro se parents prevailed on at least one issue in just 11.1% of the cases, while those with counsel were five times more likely to prevail on at least one issue (51.3%)), Kevin Hoagland-Hanson, *Comment: Getting Their Due (Process): Parents and Lawyers in Special Education Due Process Hearings in Pennsylvania*, 163 U. Penn. L. Rev. 1806, 1820 (2015) (over a five-year period, Pennsylvania parents who had legal counsel prevailed 58.75% of the time whereas *pro se* parents prevailed only 16.28% of the time); Debra Chopp, *School Districts and Families Under the IDEA: Collaborative in Theory, Adversarial in* Fact, 32-2 Nat'l Ass'n Admin. L. Judiciary 423, 461 (2014) ("It should come as no surprise that having an attorney is strongly correlated with successful outcomes at trial"); Todd Carney, *How Increased Legal Representation Can Close the Gap in Special Education Discrepancies*, 37 Touro L. Rev. 21, 60 (2021) (in Maryland, parents who

represented themselves always lost); G. Thomas Schanding, et al., *Analysis of Special Education Due Process Hearings in Texas*, at 2 (it is clear from multiple investigations that parents fare much better if represented by an attorney), available at https://journals.sagepub.com/doi/pdf/10.1177/2158244017715057, (last visited July 23, 2023); Perry A. Zirkel, *Are the Outcomes of Hearing (and Review) Officer Decisions Different for Pro Se and Represented Parents?*, 34-2 J. Nat'l Ass'n Admin. L. Judiciary 263, 281 (2014) (outcomes for *pro se* parents in due process hearings significantly less favorable than those in which both parties have legal representation); William H. Blackwell & Vivian V. Blackwell, *A Longitudinal Study of Special Education Due Process Hearings in Massachusetts: Issues, Representation, and Student Characteristics*, at 10 (Mar. 23, 2015), available at https://journals.sagepub.com/doi/pdf/10.1177/2158244015577669 (last visited July 23, 2023) (Massachusetts school districts used attorney representation and won due process hearings at notably higher levels than parents); Melanie Archer, *Access and Equity in the Due Process System: Attorney Representation and Hearing Outcomes in Illinois, 1997-2002* (2002), at 7, available at http://www.dueprocessillinois.org/Access.pdf (last visited July 23, 2023) (representation by an attorney is most important single predictor of whether a parent wins a due process hearing).

Unlike parents who are frequently unrepresented and cannot afford expert witnesses, schools are represented by counsel with expertise in special education law and can draw on the expertise of school staff (without incurring additional expense) as well as paid experts. The imbalance is perpetuated by the fact that schools often have insurance that covers special education litigation. Such insurance coverage "allows school districts to avoid internalizing all of the costs of litigation under the IDEA.  A school might refuse to provide an expensive benefit to a disabled child, knowing that it can incur up to $100,000 in legal fees at no marginal cost." Chopp, 32-2 Nat'l Ass'n Admin. L. Judiciary at 456. In addition, school districts have other funding sources to pay fees, including tax dollars paid by parents and others.  Thus, parents are often paying through their tax dollars for the very counsel fighting against them.

Recent studies of district-initiated due process hearings by leading scholars in the field, demonstrate the critical importance of attorneys' fees for parents in these cases.  *See* Perry A. Zirkel & Diane M. Holben, *District Initiated Due Process Decisions under the IDEA; Frequency and Outcomes,* 398 Educ. L Rep. 8 (2022); *District-initiated due process hearing decisions under the IDEA:  A follow-up analysis*, 398 Educ. L. Rep. 584 (2022).

The scholars found that, over a six-year period (2013-2018), district-initiated hearings were a small but significant proportion of hearings nationally, 3.8%, and

that New Jersey was among the top ten states in district-initiated hearings, with 15% of the due process hearings having been initiated by school districts. 398 Educ. L. Rep. at 10, 11.

Because IDEA's federal regulations require school districts to initiate due process hearings if they wish to oppose parental requests for Independent Educational Evaluations (IEEs), see 34 C.F.R. § 300.502(b)(2), the most frequent category of district-initiated hearing request was IEEs at public expense. *Id*. at 12. Thus, 53% of the district-initiated hearing requests involved IEEs. *Id*. Tied in second place were district-initiated hearings to obtain consent for evaluations of students and to obtain determinations on the appropriateness of placements. *Id*. at 12-13. The study found that school districts usually won the hearings that they initiated, with 98% victories in the consent for evaluations/reevaluations, 80% for FAPE progress/placements, and 77% for IEEs at public expense.

In a follow-up study, the authors looked specifically at whether attorney representation made a difference in the outcomes and found that it made a dramatic difference. 389 Educ. L. Rep. at 585. Parents prevailed with attorney representation in 61% of IEE cases but only prevailed in 10% when they were pro se. *Id*. at 590, and parents prevailed in 49% of the FAPE cases but only in 10%

when they were pro se. [2] Id.  Given that the school districts win the vast majority

of district-initiated due process hearings, and parents are successful frequently

when they are represented, most parents are unrepresented.  The scholars

concluded that this "significant disparity underlines the lack of affordable and

available parent-side special education attorneys in many parts of the country."  *Id*.

at 591.  The scholars had noted that, in determining whether to initiate a due

process hearings, school districts "had the advantage of considering in which cases,

based on availability, affordability, timing and attitude the parents were least likely

to have an attorney."  398 Educ. L. Reporter at 16, n61.

Significantly, when a parent initiates a due process hearing, the parent may

retain or consult an attorney before filing for due process and thus go into the

proceeding prepared with legal representation.  In contrast, if the district initiates a

due process hearing, a parent may be surprised by the litigation and is likely not to

be represented at that time.  Because of the tight timelines on due process hearings,

attorneys may not be available to provide legal representation after the district has

already initiated the hearing request.  Furthermore, if a school district can simply

avoid attorneys' fees by filing a withdrawal with prejudice – and thereby

---

[2] In none of the case involving consent for evaluations/reevaluations were the
parents represented.  398 Educ. L. Rep. at 590.

unilaterally eliminate the parents' right to statutory attorneys' fees, attorneys will have little incentive to provide legal representation in these cases.

## III. THIS COURT HAS CONSISTENTLY REJECTED ATTEMPTS TO LIMIT "PREVAILING PARTY" STATUS UNDER IDEA IN A MANNER THAT UNDERMINES THE STATUTORY PURPOSE

The IDEA provides, like many fee shifting statutes codified in federal law, that "the court in its discretion, may award reasonable attorneys' fees as part of the costs (I) to a prevailing party who is the parent of a child with a disability … ." 20 U.S.C. § 1415(i)(3)(B)(i). That provision applies to all prevailing parents, regardless of whether the parent has initiated the due process hearing or whether the school district has initiated the due process hearing.

"[A] prevailing party 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citations omitted). "A request for attorney's fees should not result in a second major litigation." *Id.* at 437.

Unfortunately, school districts all too often contend that the parent is not the prevailing party to deprive parents of an attorney's fee recovery and discourage attorneys from taking these cases. Because the statute plainly provides prevailing parents with attorneys' fees and parental enforcement is critical to the functioning of IDEA, this Court has consistently rejected attempts to narrowly define "prevailing party" in special education cases. Thus, in *M.R. v. Ridley School*

*District,* 868 F.3d 218, 226 (3d Cir. 2017), this Court held that parents were

prevailing parties under 20 U.S.C. § 1415(i)(3)(B)(i) when they obtained

retrospective funding of a stay-put placement via 20 U.S.C. § 1415(j).

This Court stated:

> [IDEA's] child- and parent-friendly goals are not a reason for
> us to interpret "prevailing party" under the IDEA any
> differently than we would under other statutes . . . but, in
> considering the statutory context, we must consider the
> practical consequences of withholding attorneys' fees in cases
> like this one. . . . After all, courts are "decidedly receptive" to
> remedies that are "necessary or at least helpful to the
> accomplishment of the statutory purpose.

*Id.* at 227.

In *M.R.*, the Court considered "not only the course charted by [its] prior

opinions, but also the real consequences of withholding attorneys' fees" in that

particular situation. 868 F.3d at 228. *M.R.* affirms that if a parent achieves relief

that is permanent, as opposed to injunctive and temporary, then the parent is a

"prevailing party."

Shortly after *M.R.*, in *H.E. v. Walter D. Palmer Leadership Learning

Partners Charter Sch.*, 873 F.3d 406, 409 (3d Cir. 2017), this Court reversed a

district court that had held that its order, requiring the Pennsylvania hearing officer

to hold a hearing on plaintiffs' claims, was a "purely procedural" ruling, which did

not confer prevailing party status. *Id.* at 409. This Court reversed, holding that,

"given 'the importance Congress attached' to the IDEA's procedural safeguards,

we readily conclude that even a purely procedural victory under the IDEA can confer prevailing party status." *Id.* at 413*,* quoting *Rowley*, 458 U.S. at 205.

Here, unlike *H.E.*, E.S. did not achieve a purely procedural victory. The dismissal *with prejudice* was a substantive result, precluding Plainfield from attempting to re-litigate the appropriateness of the IEP at issue. However, the holding in *H.E.* applies here. If a parent obtains relief that is not "temporary forward-looking injunctive relief, then she is a 'prevailing party' under the IDEA attorneys' fee provision and is eligible for an award of attorneys' fees." *Id.* at 413 (cleaned up). Under *H.E.,* E.S. received relief that "cannot be nullified later," which resulted in prevailing party status. *Id.*

In *E.I.H. v. Fair Lawn Bd. of Educ.*, 747 F. App'x 68 (3d Cir. 2018), this Court articulated the test for prevailing party status as (1) whether the parent obtained relief on a significant claim in the litigation and (2) whether there is a causal connection between the litigation and the relief obtained from the school district. *Id.* at 73. In that case, the parent secured the inclusion of a nurse in the student's Individualized Education Program, which was a significant change to her educational plan. *Id.* In E.S.'s case, his parent secured an enforceable right to placement at the private school that was not temporary. There was an undeniable causal connection between the litigation and the relief obtained. Under *E.I.H.*, E.S. is a prevailing party.

Equally important, as *M.R.* points out, are the "real consequences" of withholding attorney's fees in a case like this. Plainfield attempted to bully E.S. and his parent into giving up an appropriate private placement by filing for due process not once, but twice.

All of the research shows that E.S.'s chances of defending against Plainfield's actions would have decreased dramatically if he didn't have an attorney. As noted above, a recent study showed that parents who were represented won 49% of the district-initiated FAPE cases while pro se parents won a fifth as many: 10%. *See* 398 Educ. L. Rep. at 590. Furthermore, parents who are unrepresented may be so daunted by the prospect of a due process hearing that they are intimidated into giving up their claims, whether for IEEs, or opposing evaluations or for contesting whether their student is receiving FAPE. In fact, the study found that a substantial number of parents did not show up for the hearings, and in only one case did a hearing officer rule in favor of a no-show parent. *Id*. at 590, n. 43.

The question of whether a voluntary dismissal with prejudice by a plaintiff constitutes a "material alteration of the legal relationship of the parties," under *Buckhanon*, 532 U.S. at 604, has been addressed by the Second Circuit. The Second Circuit held that a voluntary dismissal with prejudice constitutes "'an adjudication on the merits for purposes of res judicata,' and any action so

dismissed could not be brought again." *Carter v Inc. Vill. of Ocean Beach*, 759 F.3d 159 (2d Cir. 2014), quoting *Chase Manhattan Bank, N.A., v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995). Similarly, the Seventh Circuit held that a defendant was a prevailing party after the plaintiff moved to voluntarily dismiss a case and the dismissal was with prejudice. *See Claiborne v. Wisdom*, 414 F.3d 715 (7th Cir. 2005). The court noted that "[a] voluntary change in conduct, taken outside of the litigation, lacks the necessary judicial imprimatur," to create a prevailing party, citing *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S 598, 605 (2001). In contrast, the voluntary dismissal with prejudice is a dismissal with prejudice that "effects a material alteration of [the party's]] legal relationship with the other parties, because it terminates any claims she may have had against them arising out of this set of operative facts. If she were to try to bring the same claim in the future, the defendants would be entitled to rely on a claim preclusion or *res judicata* defense." 414 F.3d at 719. *See also Bricklayers & Allied Craftworkers Local 1 of Pa/De v. ARB Constr., Inc.*, No. 13-3883, 2016 U.S. Dist. LEXIS 128954, at *17, 2016 WL 4943254 (E.D. Pa. Sept. 15, 2016) (voluntary dismissal with prejudice "materially alters the legal relationship between the parties"). This Court has recognized that a voluntary dismissal with prejudice of ADA claims "operated as a final judgment on the

merits for purposes of claim preclusion." *See Jackson v. Dow Chem. Co.*, 518 Fed. App'x 99, 102 (3d Cir. 2013).

In a case involving a district-initiated due process hearing, *J.B. v. San Jose Unified School District,* No. C 12-06358 SI, 2013 U.S. Dist. LEXIS 65083, at *11, 2013 WL 1891398 (N.D. Cal. May 6, 2013), the court found that the parent was the prevailing party even though the school district withdrew its complaint without prejudice because the school district would have been unable to refile the complaint as it would have been untimely. In *J.B.*, the school district had filed its due process complaint to challenge the parents' request for an IEE, the parents had then retained counsel, and "[a]fter a year and a half of litigation, the Student received everything he desired when he was reimbursed completely for the IEE and he was placed back into special education. *Id.* at *3. The court noted that "No consent decree was needed, because the District had the power both to grant the Student's IEE payment and to withdraw its complaint – the District had control over both the complaint and the remedy." *Id.* The court stated that "if a dismissal without prejudice nevertheless precludes refiling a complaint, it alters the legal relationship of the parties" and thus meets the *Buckhannon* standard. The court found that, having withdrawn the due process complaint seven months after the IEE request, the school district could no longer challenge the IEE because a new complaint would be barred due to "unnecessary delay." Id. at *11. Thus, "the

voluntary withdrawal would have essentially eliminated the right of the District to further contest the IEE, and thus enabled the finding of a prevailing party." Id. at *11-12. The court also emphasized the fact that this case involved a district-initiated due process hearing and noted "there are special concerns for students who are forced to defend themselves against due process actions by school districts, but have no leverage to enter into a consent decree." *Id.* at *12.

Finally, the potential liability for E.S.'s fees creates an incentive for school districts not to attempt to intimidate parents as Plainfield did here. *See M.R.*, 868 F.3d at 222 (recognizing that liability for attorney's fees incentivizes school district to adhere to IDEA's requirements). The denial of "prevailing party" status, by contrast, severely undermines IDEA's main purpose of ensuring "that the rights of children with disabilities and the parents of such children are protected." *M.R.*, 868 F.3d at 227 (citations omitted).

The district court acknowledged that the voluntary dismissal effected a material alteration of the parties' legal relationship but stated that the alteration was not judicially sanctioned and, therefore, it was bound by this Court's holding in *John T. v. Delaware County Intermediate Unit*, 318 F.3d 545, 560 (3d Cir. 2003) to find that the parent was not the prevailing party. *Id.* at 555. But that case involved a parent who voluntarily dismissed his own claim pursuant to Fed. R. Civ. P. 41(a). *Id.* at 551. In fact, in *John T.*, the parent did not even argue that the

voluntary dismissal made him a prevailing party; instead, he relied on having obtained a preliminary injunction, a contempt order, and an acceptable IEP, none of which constituted a finding on the merits of the claim. *Id*. at 559-61.

The District Court's decision is not merely inconsistent with Third Circuit precedent interpreting "prevailing party" under IDEA. It also significantly frustrates the legislative purpose of IDEA by depriving parents of legal representation in district-initiated cases, where the school districts can control whether they withdraw the case with prejudice at any time in the course of the due process proceeding. For these reasons, the District Court committed legal error in holding that E.S. and his mother were not entitled to attorney's fees.

## CONCLUSION

For the foregoing reasons, the judgment below should be REVERSED.

Respectfully submitted,

*/s/ Selene Almazan-Altobelli*
Selene Almazan-Altobelli
Council of Parent Attorneys
and Advocates
PO Box 6767
Towson, Maryland 21285
844.426.7224
selene@copaa.org

*/s/ Ellen Marjorie Saideman*
Ellen Marjorie Saideman
Law Office of Ellen Saideman
7 Henry Drive
Barrington, RI  02806
401.258.7276
esaideman@yahoo.com

*/s/ Catherine Merino Reisman*
Catherine Merino Reisman
Reisman Carolla Gran & Zuba LLP
19 Chestnut Street
Haddonfield, New Jersey 08033
856.354.0021
catherine@rcglawoffices.com

## CERTIFICATION OF COMPLIANCE PURSUANT TO
## FED. R. APP. 32(a)(7)(C)

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Third Circuit Rule

32-1, the attached *amicus* brief is proportionately spaced, has a typeface of 14

points as measured by Microsoft Word for Mac, and contains 6110 words.

Dated: August 1, 2023


*/s/ Selene Almazan-Altobelli*
SELENE ALMAZAN-ALTOBELLI
Attorney for *Amicus Curiae*


## CERTIFICATE OF SERVICE

I certify that on August 1, 2023, the foregoing document was served on all

parties or their counsel of record through the CM/ECF system.


*/s/Selene Almazan-Altobelli*
SELENE ALMAZAN-ALTOBELLI
Attorney for *Amicus Curiae*

**VIRUS CERTIFICATION & IDENTICAL COMPLIANCE OF BRIEF**

I, Selene Almazan-Altobelli, hereby certify that:

The electronic version of this brief is identical to the text version in the paper copies filed with the court. This document was scanned using Bitdefender Antivirus for Mac and no viruses were detected.

Dated: August 1, 2023

> */s/Selene Almazan-Altobelli*
> SELENE ALMAZAN-ALTOBELLI
> Attorney for *Amicus Curiae*

**CERTIFICATE OF BAR MEMBERSHIP**

I hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: August 1, 2023

> */s/Selene Almazan-Altobelli*
> SELENE ALMAZAN-ALTOBELLI
> Council of Parent Attorneys and Advocates
> PO Box 6767
> Towson, Maryland 21285
> 844.426.7224
> selene@copaa.org

**CERTIFICATE OF BAR MEMBERSHIP**

I hereby certify that I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: August 1, 2023

/s/ Catherine Merino Reisman
CATHERINE MERINO REISMAN
Reisman Carolla Gran & Zuba LLP
19 Chestnut Street
Haddonfield, New Jersey 08033
856.354.0021
catherine@rcglawoffices.com

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the Bar of the United States Court of

Appeals for the Third Circuit.

Dated: August 1, 2023

/s/ Ellen Marjorie Saideman
ELLEN MARJORIE SAIDEMAN
Ellen Marjorie Saideman
Law Office of Ellen Saideman
7 Henry Drive
Barrington, RI  02806
401.258.7276
esaideman@yahoo.com